## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE DISTRICT OF MINNESOTA

---

CITY OF BURNSVILLE, MINNESOTA,

         Plaintiff,

         CIV-2018-_____

v.                    JURY TRIAL DEMANDED

KOPPERS INC., RUETGERS CANADA
INC., RAIN CARBON HOLDINGS LLC,
RAIN CARBON INC., STELLA-JONES
CORP., COOPERS CREEK CHEMICAL
CORPORATION, and LONE STAR
SPECIALTY PRODUCTS, LLC,
         Defendants.

---

### COMPLAINT

Plaintiff City of Burnsville, Minnesota, ("Plaintiff" or "Burnsville" or "City") by its attorneys, Weitz & Luxenberg, P.C., Super Law Group, LLC, and Gray Plant Mooty hereby alleges as follows:

### I.    SUMMARY OF THE CASE

1.    Contamination caused by Defendants' defective coal tar products has contaminated Burnsville's stormwater ponds, costing the City substantially increased disposal costs when it dredges its ponds.

2.    Defendants take raw or crude coal tar—a toxic material left over from coal coking—and refine it into a variety of products, including one simply called refined coal tar or "Refined Tar-12." Defendants then market and sell refined coal tar specifically for use in pavement sealants. Unfortunately, refined coal tar contains high levels of chemicals called Polycyclic Aromatic Hydrocarbons ("PAHs"). Materials dredged from the City's ponds that are

contaminated with PAHs cannot be disposed of in the same manner as dredged materials that do not contain those PAHs.

3.      Defendants market and sell their specially refined coal tar products to companies that make coal tar pavement sealant.  Coal tar pavement sealant is made by mixing refined coal tar with dyes and other additives, and with aggregate material such as sand or clay.  Most coal tar pavement sealants are applied by paving companies. Coal tar sealants also are sold at retail for personal use by homeowners.

4.      Coal tar pavement sealants are used to protect paved surfaces, but they wear out. Sunlight and the elements attack these coatings continuously. Tires and snowplows abrade the surface into fine particles that are blown away by wind or washed away when it rains. Accordingly, sealant manufacturers recommend reapplication every few years.

5.      Despite knowing that their refined coal tar products contain high levels of PAHs that inevitably will end up in the environment, Defendants market and sell their products as a safe and effective component of pavement sealant.

6.      Pavement sealants do not need to be made with refined coal tar.  Asphalt-based sealants—sealants made with tar refined from crude oil instead of coal—are similar in appearance and function in the same manner, but asphalt sealants contain substantially lower levels of PAHs—lower by orders of magnitude.

7.      Defendants have been aware, or should have been aware, of studies conducted by the U.S. Geological Survey, academic institutions, and state and city scientists in various jurisdictions showing links between the use of refined coal tar in sealants and a rise in PAH contamination levels in urban lakes and ponds.   These studies also established that the

concentrations of PAHs in urban waterbodies affected by sealants containing Defendants' refined coal tars are harmful to the environment.

8.      Burnsville, like many other cities, maintains stormwater retention ponds or other stormwater-management devices that are designed to collect stormwater runoff and capture sediment.  The ponds capture and filter runoff before it reaches streams and lakes, but they need to be maintained and dredged periodically.  The PAH contamination from Defendants' coal tar products has accumulated in Burnsville's ponds.  As a result, the City has had to dispose of the dredged material as a contaminated waste that requires special handling.  This has and will continue to greatly increase Burnsville's costs for managing its stormwater infrastructure.

9.      Because sealants made with refined coal tar cause widespread pollution to and environmental problems for cities throughout the state, including Plaintiff, Minnesota has banned the use and sale of coal tar pavement sealants.  Even though coal tar pavement sealants can no longer be sold or applied legally in Minnesota, the degradation of sealants previously applied continues to cause Plaintiff Burnsville damages in the form of increased need to test stormwater sediments and increased disposal costs for PAH-contaminated dredged waste.

10.     Plaintiff Burnsville brings this action to remedy the pollution problem it faces and to recover compensatory damages including all costs to investigate, monitor, abate, contain, prevent, treat, remove, and dispose of PAHs from the City's property and waters, and to ensure that the responsible parties bear such expense, rather than the City or its citizens or taxpayers.

## II.     PLAINTIFF

11.     Plaintiff Burnsville is a municipal corporation and political subdivision of the State of Minnesota.

12.     Burnsville is the current owner and operator of multiple stormwater retention ponds and other stormwater-management infrastructure that are contaminated by the release of toxic chemicals from Defendants' products.

### III.     DEFENDANTS

13.     Defendant Koppers Inc. is a Pennsylvania corporation with a principal place of business at 436 Seventh Avenue, Pittsburgh, PA 15219.

14.     Defendant Ruetgers Canada Inc. is a Canadian corporation with a principal place of business at 725 Strathearne Avenue North, Hamilton, ON L8H 5L3.

15.     Defendant Rain Carbon Holdings LLC is a Delaware corporation with a principal place of business at 10 Signal Road, Stamford, CT 06902.

16.     Defendant Rain Carbon Inc. is a Delaware corporation with a principal place of business at 10 Signal Road, Stamford, CT 06902.

17.     Defendant Stella-Jones Corp. is a Delaware corporation with a principal place of business at 603 Stanwix St. Ste. 1000, Pittsburgh, PA 15222-1423.

18.     Defendant Coopers Creek Chemical Corporation is a Pennsylvania corporation with a principal place of business at 884 River Road, Conshohocken, PA 19428.

19.     Defendant Lone Star Specialty Products, LLC (also d/b/a Lone Star Specialties, LLC) is an Oklahoma corporation with a principal place of business at 4200 East Skelly Drive, Tulsa, OK 74135-3247.

20.     Defendants are coal tar refiners who market refined coal tar for use in sealant coatings for, among other things, roads, driveways, and roofs, and at all times relevant to this action knew or should have known that their products contain high levels of PAHs that inevitably would be released into the environment.

21.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control, or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

22.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## IV.     JURISDICTION AND VENUE

23.     Plaintiff Burnsville is a citizen of the State of Minnesota.  Defendants are citizens of States other than the State of Minnesota.  This is an action between citizens of different States, in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

24.     Based upon information and belief, Defendants transact or transacted business within the State of Minnesota, or contract or contracted to supply goods or services in Minnesota during the time frame relevant to the allegations herein.

25.     In addition, this Court may exercise personal jurisdiction over Defendants because they are either authorized to do business in Minnesota, are registered with the Minnesota Secretary of State, do sufficient business with sufficient minimum contacts in Minnesota, or otherwise intentionally availed themselves of the Minnesota market through the distribution and marketing of coal tar sealant-related binding products for use in pavement sealants in Minnesota to render the exercise of jurisdiction over Defendants by the Minnesota courts consistent with

traditional notions of fair play and substantial justice.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to the claim occurred and the property that is the subject of the action is within the District of Minnesota.

## V.     FACTUAL ALLEGATIONS

### A.     Polycyclic Aromatic Hydrocarbons ("PAHs") and Coal Tar

27.     Polycyclic Aromatic Hydrocarbons, or "PAHs," are a group of chemical compounds that form whenever anything with a carbon base, such as coal, is incompletely burned.

28.     PAHs are dangerous to the environment.  According to the U.S. Environmental Protection Agency ("EPA"), PAHs are an environmental concern because several are toxic and also persistent—that is, they can stay in the environment for extremely long periods of time. Most do not break down easily in water or the environment.

29.     EPA has designated 16 PAHs as priority pollutants (listed at 40 CFR Part 423, Appendix A) because of their toxicity and potential for human exposure.

30.     At least eight of the 16 priority PAHs are present in coal tar.  These 16 PAHs are "parent" PAHs.  There also are many derivative PAH molecules that are variants on these 16 parent PAHs.  Some particularly toxic PAHs, such as benzo(a)pyrene, are frequently measured separately, but often PAH values are aggregated and presented as "Total PAHs."

31.     Crude coal tar is a byproduct of the coking of coal for the steel industry.  The process involves heating coal at high temperatures to force out impurities and produce coke, which is almost pure carbon.  The coke is used by the steel industry in blast furnaces that convert iron ore to steel.  Crude coal tar is the leftover waste from this partial combustion of coal to form

coke, and it is loaded with PAHs.

32.   Defendants distill crude coal tar primarily for the production of certain chemicals, oils, industrial feedstocks and other products.  After removing various oils from the crude tar, what remains is coal tar pitch.

33.   Coal-tar pitch is 50 percent or more PAHs by weight.

34.   Most of the coal tar pitch produced in North America is used as a binder in industrial processes, such as aluminum production.

35.   Defendants also process some coal tar pitch into a refined coal tar product often referred to in the industry as "Refined Tar 12" or "RT-12."  This refined coal tar is specifically formulated for use in pavement sealants, marketed for use in sealant products, and sold to sealant manufacturers.

36.   The refined coal tar used in pavement sealant products can contain upwards of 50 percent PAHs by weight.

37.   Depending on price and availability, a sealant manufacturer may purchase refined coal tar from several different suppliers throughout a given time frame.

38.   Coal-tar-based pavement sealants typically consist of 20 to 35 percent refined coal-tar as a binder.

**B.     Coal-tar-based and Asphalt-based Sealants**

39.   Pavement sealant, or sealcoat, is a black liquid that is sprayed or painted on paved surfaces, such as driveways, parking lots and, occasionally, playgrounds in order to beautify and protect the paved surface below from oil damage and weathering.

40.   Some of the PAHs from refined coal tar begin to evaporate out of the sealant and enter the environment almost immediately upon application. And within a few years the

combination of friction from vehicles and exposure to the elements causes the pavement sealant to wear away into a fine particle dust containing more PAHs. Some of the particle dust blows away on the wind and is deposited widely. Some of the coal tar pavement sealant particles get washed away—carried by stormwater into drains, sewers, and other stormwater management devices, and ultimately into nearby waterbodies.

41.     Despite knowing that pavement sealants degrade and wear away, and that pavement sealants are therefore generally reapplied every few years, Defendants take coal tar pitch, a substance that contains upwards of 50 percent PAHs, refine it into a coal tar product that also contains very high concentrations of PAHs, and specially market and sell that refined coal tar for use in making coal tar pavement sealants. Those sealants quickly wear away and end up as a fine toxic dust that accumulates on the ground and in Burnsville's stormwater ponds.

42.     In contrast, some pavement sealants are made from asphalt tar, not coal tar.

43.     Asphalt is a tarry substance refined from crude oil, not coal.

44.     Coal tar sealants have about 1,000 times higher concentrations of PAHs than asphalt-based sealants.

45.     According to the U.S. Geological Survey ("USGS"), PAH concentrations in asphalt-based sealants are around 50 mg/kg, while coal tar sealants normally have PAH concentrations ranging from 50,000 to 100,000 mg/kg, although the PAH concentrations in some coal tar sealants exceed 200,000 mg/kg (i.e. 20 percent PAHs).

46.     Coal-tar-based sealants are commonly used in the central, southern, and eastern United States. Asphalt-based sealants are commonly used in the western United States.

47.     Studies conducted by the USGS show that PAHs in dust on pavement sealants in the central and eastern United States, where coal-tar-based sealants are predominantly used, are

about 1,000 times higher than in the western United States where asphalt-based sealants are more commonly used.

48.     Apart from their radically different PAH concentrations, there is no significant difference between coal-tar-based and asphalt-based sealants.  They are similar in appearance, price, and function.

### C.      Coal-tar-based Sealants Are a Major Source of Urban Contamination

49.     The USGS has identified an unusual trend: PAH concentrations are increasing in many urban ponds, lakes and rivers in the United States, even as concentrations of other contaminants are decreasing.

50.     For example, the City of Austin, Texas, found concentrations of PAHs in sediment samples collected from small tributaries and drainage structures in largely residential areas.  The PAH levels were as high as those found in soil samples at some Superfund sites.

51.     The USGS has concluded that PAHs released from refined coal tar used in pavement sealants may now be the largest active source of PAHs in the United States, that sealants made with refined coal tar emit more PAHs into the environment every year than the entire U.S. vehicle fleet, and that these sealants are the largest sources of PAH contamination in urban lakes, account for more than half of the PAHs found in those lake sediments, and are the primary cause of the upward trend in PAH concentration levels in urban lake sediments since the 1960s.

52.     Many of these findings are supported by research conducted independently by the Minnesota Pollution Control Agency ("MPCA").

53.     PAH contamination from coal tar sealants spreads widely from its point of origin.

54.     The USGS has found that a very large fraction of the PAHs found in coal tar

sealants tends to volatilize into the air in the months after application. Some of these volatilized PAHs are later deposited elsewhere in the environment.

55.     In addition, particles of sealant that wear away are small and light enough to be blown around by the wind, picked up on car tires, and otherwise transported significant distances from their point of origin. The USGS found that in cities where use of coal tar sealant is common, even samples collected from unsealed parking lots exhibit higher PAH concentrations than similar parking lots from cities where use of coal tar sealant is rare or non-existent. The USGS hypothesized that the difference in PAH levels on unsealed parking lots in these different cities occurs because PAH-contaminated dust from coal-tar sealed parking lots is being transported widely, including to unsealed parking lots.

56.     Because the extent and severity of the problem have only recently come to light, waterbodies are not routinely tested for the presence of PAHs. Consequently, although the contamination problem is widespread, only a handful of the hundreds of thousands of waterbodies polluted by coal tar pavement sealants are recognized as environmentally impaired by the states or the federal government. Similarly, in most of the country, sediments and wastes that must be disposed of are not routinely tested for PAHs.

### D.     Burnsville's Stormwater Management

57.     Burnsville owns and maintains stormwater retention ponds and other stormwater-management devices that are designed to capture and filter stormwater runoff.

58.     Dredged material from stormwater ponds is regulated by the Minnesota Pollution Control Agency as a waste pursuant to Minn. Stat. 115.01 and Minn. Stat. 115.03, subd. 1(e).

59.     The MPCA's current guidance manual for the management of dredged materials explains that, in most circumstances, managers of dredged sediment from urban stormwater

ponds are required to sample dredged sediments for the presence of PAHs.

60.     The results of these sampling efforts are measured against criteria called Soil Reference Values (SRVs).  If pollution levels in the dredged material do not exceed any SRVs, the material may be reused or disposed of freely.  But if pollution levels exceed certain thresholds set in the SRVs, the dredged material must be disposed of at a solid waste facility, which requires both hauling the material to the facility and then paying a fee for disposal.

61.     Accordingly, when PAH levels in stormwater pond sediments exceed the Soil Reference Values, disposal costs rise dramatically.

62.     Burnsville has incurred and will incur damages in the form of increased testing and disposal costs because of the PAHs released from Defendants' products.    These damages are expected to exceed $75,000.

63.     As more of Burnsville's ponds reach capacity and are tested for sediment disposal and dredging, the cost of disposal is expected to rise.

## FIRST CLAIM FOR RELIEF – STRICT LIABILITY FOR DESIGN DEFECT AND/OR DEFECTIVE PRODUCT

64.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

65.     Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of refined coal tar and refined coal-tar byproducts for use in pavement sealants.

66.     As designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of refined coal tar and coal-tar byproducts for use in pavement sealants, Defendants owed a duty to all persons whom Defendants' refined coal tar products might foreseeably harm, including Plaintiff, not to market and sell any product which is unreasonably dangerous for its

intended and foreseeable uses.

67.     Defendants represented, asserted, claimed and warranted that refined coal tar-based products could be used safely in pavement sealants in the same manner as similar products not containing refined coal tar.

68.     When Defendants placed refined coal tar-based products into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for their intended, foreseeable and ordinary uses for the following reasons:

        a.     Coal tar and refined coal tar contain high levels of PAHs and other chemicals, some of which are known carcinogens;

        b.     Coal tar sealants typically are comprised of 20 to 35 percent of refined coal tar;

        c.     The PAH concentrations in some coal tar sealants exceed 200,000 mg/kg (i.e. 20 percent PAHs);

        d.     As pavement sealants degrade, the PAHs and other substances in the sealant are released into the environment;

        e.     When coal tar sealant waste accumulates in Plaintiff's stormwater ponds, the cost of dredging and disposing of the stormwater sediment increases substantially;

        f.     Defendants, with knowledge of the risks of using refined coal tar in sealants, failed to use reasonable care and ignored these risks, and marketed and sold refined coal-tar products to manufacturers of pavement sealants;

      g.     Pavement sealants containing refined coal tar pose greater danger to the environment than would be expected by ordinary persons such as Plaintiff and the general public exercising reasonable care;

      h.     The risks that sealants containing refined coal tars pose to the environment outweigh their utility in acting as a binding agent in pavement sealants;

      i.     Refined coal tar is not a necessary component of pavement sealant.  Safe and feasible alternatives to refined coal-tar exist and have been available at all times relevant to this litigation for the purposes of acting as a binding agent.  Such sensible alternatives include asphalt-based tar.

69.     The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by pavement sealants made with coal tar.

70.     Refined coal tar was distributed and sold in the manner intended or reasonably foreseen by Defendants, or as should have been reasonably foreseen by Defendants.

71.     Refined coal tar reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

72.     Pavement sealants containing refined coal tar fail to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

73.     Refined coal tar was defective and unreasonably dangerous when the product left Defendants' control.

74.     As a direct and proximate result of Defendants' acts and omissions as alleged in this Complaint, Plaintiff's property was and is contaminated with PAHs.  Plaintiff has incurred,

is incurring, and will incur, substantial investigation, remediation, cleanup, removal, treatment, disposal, and monitoring costs and expenses related to contamination of Plaintiff's property, for which Defendants are strictly, jointly, and severally liable.

75.    The injuries to Plaintiff's property caused and/or threatened by Defendants' acts and omissions as alleged in this Complaint are indivisible.

76.    Coal tar sealants made with each Defendant's refined tar products were used throughout Burnsville.  As the sealants degraded, PAHs from each Defendant's refined coal tar spread widely throughout Burnsville, affecting its stormwater ponds and infrastructure.

77.    Further, it is impossible, based upon physical characteristics, to identify the refiner of the coal tar or the manufacturer of any given quantity of coal tar sealant that was the source of PAHs found in Plaintiff's stormwater retention ponds and other stormwater-management devices.

78.    Plaintiff must therefore pursue all Defendants, jointly and severally, for those injuries that all Defendants have collectively visited upon each Plaintiff.  Defendants are collectively liable under traditional causation theories.

79.    Defendants also are liable under theories of market share liability, alternative liability, concert of action liability, and/or enterprise liability for injuries caused by them.

80.    Defendants manufactured, promoted, marketed, distributed, refined, supplied, and/or sold refined coal tar products with deliberate disregard of and indifference to the probable dangerous consequences of that conduct and its foreseeable impact upon Burnsville.

## SECOND CLAIM FOR RELIEF – PRIVATE NUISANCE

81.    Plaintiff Burnsville realleges each of the preceding paragraphs, and by this reference incorporates each such paragraph as though set forth here in full.

- 14 -

82. Minn. Stat. § 561.01 provides that: "[a]nything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance. An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered."

83. Burnsville is the owner of property including stormwater retention ponds and other stormwater-management devices intended to capture stormwater runoff.

84. Defendants' activities, as alleged herein, have resulted in the contamination of Burnsville's stormwater retention ponds and other stormwater-management devices intended to capture stormwater runoff.

85. The nuisance conditions caused, contributed to, maintained, assisted and/or participated in by the Defendants have caused substantial injury to Burnsville property.

86. The nuisance conditions caused, contributed to, maintained, assisted and/or participated in by the Defendants are injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property because the City no longer can use its stormwater retention ponds and other stormwater-management devices in the manner it intended, in that they have been contaminated with high levels of toxic chemicals. The City has incurred, is incurring, and will continue to incur, investigation, treatment, testing, waste disposal and monitoring costs to address this contamination on its property.

87. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Burnsville's stormwater retention ponds and other stormwater-management devices have

been contaminated, causing Burnsville significant injury and damages. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Burnsville has incurred, is incurring, and will continue to incur, investigation, treatment, testing, waste disposal and monitoring costs and expenses exceeding $75,000 related to the contamination.

## THIRD CLAIM FOR RELIEF – NEGLIGENCE

88. Burnsville realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

89. As designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of refined coal tar products for use in pavement sealants, Defendants owed a duty to all persons whom Defendants' refined coal tar products might foreseeably harm, including Plaintiff.

90. Defendants had a duty not to contaminate the environment.

91. At all times relevant to this litigation, Defendants knew or should have known the facts set forth above in paragraph 68.

92. Defendants have negligently breached their duties of care to Plaintiff by: marketing and selling refined coal tar and refined coal-tar products for use in pavement sealants; negligently causing the release of PAHs and other contaminants into the environment; and failing to remediate PAHs released into the environment.

93. In light of Defendants' actions, Plaintiff would not have been able to avoid the harm caused by pavement sealants with coal tar through the use of reasonable care.

94. Refined coal tar, and pavement sealants containing refined coal tar, were distributed, sold, and used in the manner intended or reasonably foreseen by Defendants, or as should have been reasonably foreseen by Defendants.

95. Refined coal tar, and pavement sealants containing refined coal tar, reached

consumers and the environment in a condition substantially unchanged from that in which it left Defendants' control.

96.     Pavement sealants containing refined coal tar failed to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

97.     As a direct and proximate result of Defendants' acts and omissions as alleged in this Complaint, Plaintiff's property was and is contaminated with PAHs.  Plaintiff has incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, removal, treatment, waste disposal, and monitoring costs and expenses related to contamination of Plaintiff's property in an amount in excess of $75,000, for which Defendants are strictly, jointly, and severally liable.

## JOINT AND SEVERAL LIABILITY

98.     The injuries to Plaintiff's property caused and/or threatened by Defendants' acts and omissions as alleged in this Complaint are indivisible.

99.     Coal tar sealants made with each Defendant's refined coal tar products were used throughout Burnsville.  As the sealants degraded, PAHs from each Defendant's refined coal tar spread widely throughout Burnsville, affecting all of its stormwater ponds and infrastructure.

100.     Further, it is impossible, based upon physical characteristics, to identify the manufacturer or refiner of any given quantity of refined coal tar or coal tar pavement sealant that was the source of PAHs found in Plaintiff's stormwater retention ponds and other stormwater-management devices.

101.     Plaintiff must therefore pursue all Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon Plaintiff.  Defendants are collectively

liable under traditional causation theories as well as theories of market share liability, alternative liability, concert of action liability, and/or enterprise liability for injuries caused by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Burnsville respectfully requests a trial of this Action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Burnsville and against Defendants, awarding Burnsville:

a.   Compensatory damages according to proof;

b.   Injunctive and equitable relief to compel Defendants to abate the continuing nuisance by removing toxic chemicals, including PAHs, from the Plaintiff's stormwater retention ponds and other stormwater-management devices;

c.   Costs of litigation;

d.   Prejudgment interest;

e.   Attorneys' fees; and

f.   Such other and further relief as the Court may deem just and proper.

DATED:      December 28, 2018

By:   */s/ Daniel R. Shulman*
Daniel R. Shulman, #100651
Janet Evans, #182734
Nancy Burke, #161044
**GRAY PLANT MOOTY**
500 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  612-632-3335
Facsimile:  612-632-4335
daniel.shulman@gpmlaw.com
janet.evans@gpmlaw.com
nancy.burke@gpmlaw.com
***Attorneys for Plaintiff***

- 18 -

*/s/ Robin L. Greenwald*
Robin L. Greenwald, Esq.
Nancy Christensen, Esq.
(Motions for *Pro Hac Vice* admission to be filed)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY  10003
Telephone:  212-558-5505
Facsimile:  212-344-5461
rgreenwald@weitzlux.com
nchristensen@weitzlux.com
***Attorneys for Plaintiff***

*/s/ Edan Rotenberg*
Edan Rotenberg
Reed Super
Nicholas Tapert
Michael DiGiulio
(Motions for *Pro Hac Vice* admission to be filed)
**SUPER LAW GROUP, LLC**
180 Maiden Lane, Suite 603
New York, NY 10038
Telephone: 212-242-2355
Facsimile: 855-242-7956
edan@superlawgroup.com
***Attorneys for Plaintiff***